## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

PLAINS ALL AMERICAN PIPELINE, L.P.,

        Plaintiff,

        vs.

THOMAS COOK, in his capacity as the Secretary of
Finance for the State of Delaware; DAVID M.
GREGOR, in his capacity as the State Escheator of
the State of Delaware; MICHELLE M. WHITAKER,
in her capacity as the Audit Manager for the State of
Delaware and KELMAR ASSOCIATES, LLC,

        Defendants.

Civil Action No.

## VERIFIED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Plaintiff Plains All American Pipeline, L.P. ("Plains" or "Plaintiff") brings this action for

declaratory judgment and injunctive relief pursuant to 28 U.S.C. §§ 2201-02 and 42 U.S.C. §

1983. In support of its claims, Plaintiff would respectfully show the following:

### NATURE OF THE PROCEEDING

1.     Plains seeks a declaration that the State of Delaware, through its agent and

auditor, Kelmar Associates, LLC ("Kelmar"), has subjected, and continues to subject, Plains to

an unclaimed property audit under DEL. CODE tit. 12, § 1155 that (1) infringes on Plains' right

under the Fourth Amendment to the United States Constitution to be free from unreasonable

searches and seizures; (2) deprives Plains of its substantive due process rights under the

Fourteenth Amendment to the United States Constitution; (3) deprives Plains of its procedural

due process rights under the Fourteenth Amendment to the United States Constitution; (4) has

subjected Plains to an unconstitutional taking of private property for public use without just

compensation; and (4) has violated Plains' Fourteenth Amendment right to equal protection of the laws.

2.      Plains also seeks a declaration that Delaware's retroactive application of DEL. CODE tit. 12, § 1155, as amended in 2010 by Senate Bill No. 272, to allow the State Escheator to estimate a holder's liability when the holder has failed to maintain adequate records, is a violation of the Constitution's Ex Post Facto Clause. *See* U.S. Const. art. I, § 10.

3.      Lastly, Plains seeks a temporary and permanent injunction, enjoining the Delaware Defendants and Kelmar from further violating its constitutional rights.

## THE PARTIES

4.      Plains is a limited partnership organized under the laws of the State of Delaware, with its principal place of business in Houston, Texas. Plains was formed on September 17, 1998.

5.      Thomas Cook is the Delaware Secretary of Finance, located at Carvel State Office Building, 820 North French Street, Wilmington, Delaware. Delaware's unclaimed property law provides that "[t]here shall be an Escheator of the State, who shall be the Secretary of Finance or the Secretary's delegate. The administration and enforcement of [Delaware's unclaimed property laws] are vested in the Secretary of Finance or the Secretary's delegate." *See* DEL. CODE tit. 12, § 1102.

6.      David M. Gregor is the Secretary's delegate as the Delaware State Escheator, and is located at Carvel State Office Building, 820 North French Street, Wilmington, Delaware.

7.      Michelle M. Whitaker is the Delaware Abandoned Property Audit Manager and reports directly to, and is under the direction of, the State Escheator.

8.      Thomas Cook, David M. Gregor, and Michelle M. Whitaker are collectively referred to herein as "Delaware" or "Delaware Defendants," and they can each be served with

process *via* Matthew Denn, Esquire, Attorney General of the State of Delaware, Delaware Department of Justice, Carvel State Office Building., 820 North French Street, 6th Floor, Wilmington, Delaware 19801.

9.      Kelmar Associates, LLC is a Delaware limited liability company with its principal place of business at 500 Edgewater Drive, Wakefield, Massachusetts.  It can be served with process through its registered agent, Corporation Trust Center, which is located at 1209 Orange Street, Wilmington, Delaware 19801. The Delaware Defendants (or Delaware) and Kelmar shall be referred to herein as the "Defendants."

## JURISDICTION AND VENUE

10.      This Court has jurisdiction under 28 U.S.C. § 1331, as this case presents claims that arise under the laws and Constitution of the United States.

11.      Venue is proper pursuant to 28 U.S.C. § 1391(b)(1) and (2) because four Defendants reside in the district and a substantial part of the events giving rise to the claims at issue occurred in this district.

12.      This Court has the authority to enter a declaratory judgment and award injunctive relief under 28 U.S.C. §§ 2201-02.

## FACTUAL ALLEGATIONS

### Overview

13.      Over the past five years, the State of Delaware, along with its agent and auditor, Kelmar, which is retained by the State of Delaware on a contingent fee, has transformed Delaware's Abandoned and Unclaimed Property Law ("DUPL") from a statute originally designed to protect property holders by transferring actual unclaimed property to the State to be held in trust for the benefit of the actual owner, to a statute that merely provides a source of revenue for the State's General Fund.  Rather than focus on specific, identified property that has

-3-

not been claimed by its actual owner, Defendants instead require large companies, like Plains, to submit to wide-ranging, lengthy audits going back to 1981—almost 35 years in the past. In these audits, the auditor, Kelmar, first determines the size of the target company to determine how much revenue it may be able to collect, and second, goes back almost 35 years in time to try to recover what it can because it is paid a contingent fee based on the size of the recovery.

14.    Defendants and their auditors require audited companies to submit to audits going back almost 35 years, and if those companies do not have records supporting their unclaimed property reports for all those years—records they were never required to keep by law or otherwise—Defendants use an arbitrary estimation methodology to determine the amount of unclaimed property they guess, but do not know, those companies should have had during the audit period.

15.    These estimations are not tied to actual property—they are pure guesses and speculations. Defendants do not seek to have Plains or other holders turn over specific property for which no owner is known or no address is known; rather, Defendants seek to have them simply pay an arbitrary amount they speculate might be owed if the unknown information was known.

16.    The practice by Defendants, and their for profit collection agent, Kelmar, may come as a surprise, as it should, but it is a practice that has been addressed and strongly criticized by some commentators.

> As a preferred state of incorporation, Delaware is particularly active in pursuing unclaimed property audits. Moreover, unlike some states, Delaware deposits all unclaimed property collections directly into the state's general fund. According to the Delaware Fiscal Notebook, the state's unclaimed property collections rose from $106 million in 1998 to $493 million in 2010. In fact, unclaimed property assessments are the third largest source of revenue for the state, accounting for approximately 15% of total

revenue—more than the state lottery, and more than corporate income taxes, cigarette taxes, alcoholic beverage taxes, and inheritance taxes combined.

\* \* \*

In a 2010 working paper, the Washington Legal Foundation issued a warning to businesses incorporated in Delaware, stating: "[T]he Delaware Division of Revenue ... is a tough adversary and auditor of companies' unclaimed property liabilities, as evidenced by penalties and interest that often equal up to 75 percent of an unclaimed property assessment. The Division is also creative at identifying other items that it contends are unclaimed 'property.' Because Delaware provides no statute of limitations defense for a holder that has not filed Delaware unclaimed property reports, the Division's unclaimed property audits routinely cover all years back to 1981 (the year Delaware enacted its unclaimed property statute), or to the year the holder was incorporated or organized in Delaware if more recent."

Chris Hopkins & Matthew Hedstrom, *Unclaimed Property Laws: Custodial Safekeeping or Disguised Tax?*, 21 JOURNAL OF MULTISTATE TAXATION AND INCENTIVES 9 (January 2012).

17.     Defendants have notified Plains that Plains is the subject of an unclaimed property audit to be conducted by Kelmar.  Kelmar sent Plains initial requests for Plains to produce documents—a procedure that is unauthorized and unconstitutional—and Plains has objected, in writing, to these requests, to the estimation process, and to various other aspects of the audit process.  Defendants have rejected all of Plains' objections.

18.     The Delaware statute does not authorize Defendants to issue an administrative subpoena, and no warrant has been issued for a physical inspection of Plains' private records. Even if Defendants had the statutory authority to issue a document request, which they do not, the document requests issued by Kelmar to Plains exceed those permissible under the Fourth Amendment.  The statutes do not provide for any pre-enforcement court review, which is itself a constitutional problem, and Defendants have threatened Plains with penalties if Plains does not

comply or cooperate, apparently including any attempt by Plains to assert its Fourth Amendment rights.

19.    The estimation process violates Plains' substantive due process rights and constitutes an unconstitutional taking of private property for public use without compensation because, as described above, it involves the taking of Plains' own property rather than a transfer of other individuals' property to be held in trust by the State of Delaware.  The retroactive application of penalties and estimates of liability based on a failure to keep records that were not previously required also violates Plains' due process rights.

20.    The method of selecting Plains as a target for an unclaimed property audit violates Plains' Fourteenth Amendment right to equal protection of the laws because Defendants chose Plains as a target based on its perceived profitability and not based on neutral criteria or any criteria bearing a rational relationship to a legitimate governmental interest.  The entire audit process is unconstitutional, both facially and as it has been applied to Plains, and Plains accordingly seeks this Court's protection from Defendants' unconstitutional and impermissible acts.

**Delaware's Unclaimed Property Law**

21.    Each of the 50 states and the District of Columbia has "unclaimed property" or "escheat" laws that require companies holding unclaimed property, whether tangible or intangible, to turn that property over to the state. The states do not take title to the property, but instead hold it as custodians and use it for the benefit of the general public until the true owner comes forward to claim it.

22.    Most states, with the exception of Delaware and five others, model their unclaimed property laws on the Uniform Unclaimed Property Act ("UUPA").

-6-

23. Delaware's unclaimed property law is found in Chapter XI, Title 12 of the Delaware Code. The purpose of the DUPL is to provide for the "care and custody . . . of all abandoned property paid to the State Escheator until the property is reclaimed by the true owner." DEL. CODE tit. 12, § 1144(a).

24. In *Delaware v. New York*, 507 U.S. 490 (1993) and *Texas v. New Jersey*, 379 U.S. 674 (1965), the United States Supreme Court established "priority rules" to resolve conflicting claims of different states to "intangible" unclaimed property, such as uncashed checks. Under the "primary rule," the power to escheat intangible property is accorded to the state of the creditor (often the payee of a check) as recorded on the books and records of the debtor (the obligor of the debt underlying the check). If the debtor does not have the name and address of the owner/creditor, the property escheats to the debtor's state of domicile under the "secondary rule."

25. By operation of the "secondary rule," Delaware, as the state of incorporation/formation to over one million legal entities, has the right to escheat hundreds of millions of dollars of unclaimed property every year.  Specifically, whenever a Delaware company is holding intangible unclaimed property, such as uncashed checks, unapplied credits, or unused rebates, Delaware has the right to take possession of that property whenever the company's records do not reveal the debtor's "last known address."

**Audits, Document Retention, and Estimation**

26. Section 1155 of the DUPL provides that "[t]he State Escheator may at reasonable times and upon reasonable notice examine the records of any person or business association or organization to determine whether the person has complied with any provision of this chapter[.]"

27. Unlike the unclaimed property laws in most states, the DUPL does not provide a set "look-back" period for audits.  In 2012, the State Escheator promulgated a regulation that

purports to give him the authority to "examine[] records created on or after **January 1, 1981** to determine whether the person under examination has complied with any provision of 12 Del. C. Ch. 11." *See* Code Del. Regs. Escheat II.

28.     Despite instituting a 35-year "look-back" period for audits, the State Escheator has admitted that most holders do not retain records for more than seven to ten years. Moreover, the DUPL does not require and has never required holders to keep records for a minimum period of time and/or keep records of owners' addresses. This is in contrast to the UUPA, which imposes an express ten-year document retention requirement.

29.     In July of 2010, § 1155 of the DUPL was amended by Senate Bill No. 272 ("S.B. 272") to give the State Escheator the authority to estimate a holder's liability for unreported unclaimed property "[w]here the records of the holder available for the periods subject to [audit] are insufficient to permit the preparation of a report." So, while the DUPL does not require a holder to maintain records, the consequence of not having those records today is that:

> [T]he State Escheator may require the holder to report and pay to the State the amount of abandoned or unclaimed property that should have been but was not reported that the State Escheator reasonably estimates to be due and owing on the basis of any available records of the holder or by any other reasonable method of estimation.

**Estimation is a Punitive Measure**

30.     The 2010 amendment to §1155 is modeled after Section 20(f) of the 1995 Uniform Unclaimed Property Act, which provides:

> If, after the effective date of this [Act], a holder does not maintain records as required by **Section 21**, and the records of the holder available for the periods subject to this [Act] are insufficient to permit the preparation of a report, the administrator may require the holder to report and pay to the administrator the amount the administrator reasonably estimates, on the basis of any available records of the holder or by any other reasonable method of

estimation, should have been but was not reported. (emphasis added)

31.    Unlike the DUPL, Section 21 of the UUPA imposes an express ten-year document retention requirement. Section 20(f) is intended to penalize a holder for failing to comply with that UUPA's document retention requirement. Because estimation under Section 20(f) is intended to punish the holder, rather than identify actual unclaimed property, it does not apply retroactively.

32.    The State Escheator, however, has taken the position that the 2010 amendment to § 1155 applies retroactively. Consequently, if a holder does not have sufficient records to prove its compliance for each year going all the way back to 1981, Defendants will estimate the amount of unclaimed property that Defendants believe the holder should have reported during those years.

33.    To estimate a holder's liability for past years, Defendants first identify the holder's actual unclaimed property in recent years for which records exist, including (1) unclaimed property that was actually escheated to Delaware; (2) actual unclaimed property that should have been escheated to Delaware; (3) unclaimed property that was actually escheated to another state; and (4) actual unclaimed property that should have been escheated to another state. Defendants add these amounts together and divide the sum by the holder's total revenue during those same years. This produces what Defendants refer to as the holder's "escheat percentage." Defendants multiply the escheat percentage by the holder's total revenue during past years for which records are no longer available.  This becomes the holder's estimated liability (the "Estimated Liability Amount"), which is purely a speculative number.

34.    Because the Estimated Liability Amount is not based on actual records, the "unclaimed property" that Defendants estimate is not tied, and cannot be tied, to a particular

owner, and so the holder's records cannot reveal a "last known address" because there is no, and can be no, associated owner; it is all an absolute fiction designed to maximize the revenue stream to the State and also Kelmar's coffers.  Delaware treats the entire amount of estimated liability as "no address property," which Delaware then escheats according to the "secondary rule" in *Texas v. New Jersey* and *Delaware v. New York.*

35.    The constitutionality of this highly questionable practice is currently being challenged in federal court. *See Temple-Inland, Inc. v. Cook*, CV 14-654-SLR. In that case, Kelmar audited the plaintiff and identified only $147.30 of actual unclaimed property.  Using its estimation method (described above in paragraph 33), Kelmar turned that $147.30 of actual unclaimed property into an estimated liability of $1,388,426.67. The plaintiff in that case has argued that, among other things, the retroactive applicable of § 1155 violates (1) the Constitution's Ex Post Facto Clause and (2) the holder's substantive due process rights.

36.    If Delaware's retroactive application of the 2010 amendment to § 1155 is declared unconstitutional, it will greatly impact the scope and burden of all pending and future Delaware unclaimed property audits, which, as of now, are driven entirely by the lucrative prospect of estimation.

**Financial Incentives**

37.    For its services, Kelmar receives a contingent fee based on the amount Delaware is able to recover from the companies that it audits; the more liability that Kelmar is able to impose upon a target company, the more it gets paid. Since 2013, the Delaware Department of Finance has paid Kelmar **$104,421,598.50**.  *See* http://checkbook.delaware.gov.

38.    Kelmar also goes out and solicits other states—which it refers to as its "clients"— to join ongoing Delaware audits.  As more states join, the audit transforms into an amorphous, nationwide expedition led by Kelmar, with Delaware as its centerpiece.  Kelmar receives a

-10-

contingent fee from each state. The audit itself has no procedures authorized by law—just Kelmar's own private, internal procedures—and there is no way to effectively object to Kelmar's demands or unconstitutional process.

39.     For Delaware, unclaimed property has become the State's third largest source of revenue, bringing in approximately $475 million in the last fiscal year. Although Delaware has benefited financially from its relationship with Kelmar, its corporate friendly reputation has taken a well-publicized hit. *See* Douglas Lindholm, *Once A Friendly Locale To Business The Modern State Of Delaware Is A Bully*, FORBES, Op-ed, Mar 16, 2013, *available at* http://www.forbes.com/sites/realspin/2013/05/16/once-a-friendly-locale-to-business-the-modern-state-of-delaware-is-a-bully.

**Delaware Itself Has Recognized the Problems with the Unclaimed Property Audits**

40.     In 2014, amid public outcry over Delaware's aggressive unclaimed property audits, and particularly the use of "estimation," the 147th General Assembly established the Unclaimed Property Task Force ("Task Force") to investigate the fairness of Delaware's unclaimed property program. In December of 2014, the Task Force issued its final report ("TFR"). *See* **Exhibit A**. Among other things, the TFR reveals that, of all the revenue that is collected from general ledger audits, 80-85% comes from estimation of companies' liability, rather than actual unclaimed property. *Id.* at 8.

41.     The TFR also sheds light on the close relationship between Kelmar and the Delaware Department of Finance. In June 2014, Delaware had 375 pending unclaimed property audits; Kelmar was handling 300 of those audits. *Id.* at 55. Moreover, the last two Delaware State Escheators are now employed by Kelmar, and Delaware's last State Escheator, Mark Udinski, is now a managing director at Kelmar.

-11-

42.     For Delaware companies, the inaccurate, unconstitutional assessments of liability based on estimates are only one issue with Delaware's unclaimed property regime. The conduct of the audits themselves also presents a serious problem. A Delaware unclaimed property audit led by Kelmar is a long and expensive process. It begins when Kelmar identifies a company as a potentially lucrative target. After the State Escheator gives Kelmar authority to proceed with an audit, Kelmar assumes total control of the process—it formulates the document requests; it determines whether to audit the company's subsidiaries and affiliates; and it decides whether estimation is needed.

43.     Although the Delaware State Escheator claims that an unclaimed property audit should take no more than one year, *see* Code Del. Regs. Unclaimed Prop. 2, a recent survey conducted by the Council On State Taxation ("COST") revealed that the average Delaware audit conducted by Kelmar lasts between three and eight years. Moreover, companies responding to the survey said they spent "over $1 million in legal fees and staffing costs as a result of the audit," which does not include the assessment itself. *See* TFR (Exhibit A) at 59.

**Delaware's Audit of Plains**

44.     In a letter dated October 22, 2014, Ms. Whitaker notified Plains that Delaware, through its agent, Kelmar, would be conducting an examination of Plains' "books and records," and the "books and records" of Plains' "Subsidiaries and Related Entities" (hereinafter the "Audit"). The letter states that the purpose of the Audit is to "determine [Plains'] compliance with Delaware escheat laws," and that "the scope of the examination will be for the period 1986 through present contingent on the examination being completed by June 30, 2015, [but] [i]f the examination is completed after June 30, 2015, the scope will be 1981 through present." The letter states that Kelmar will meet (in person) with Plains and that Plains should have documents ready for Kelmar to inspect at that meeting.

-12-

45.     Although the stated purpose of the Audit is to verify Plains' compliance with "Delaware escheat law," the letter instructs Plains to "have available all of Plains All American Pipeline's prior years' reports of unclaimed property and supporting documentation for *all states*[.]" The letter further states that the Audit Manager, Ms. Whitaker, is the "final arbiter of any disputes that may arise during the course of the examination."

46.     Coincidentally, between October 31, 2014 and January 31, 2015, Kelmar solicited an additional twelve states to join Delaware's audit of Plains: Alaska, Minnesota, Idaho, Wisconsin, New Hampshire, California, Connecticut, Arizona, Massachusetts, Pennsylvania, South Dakota and Illinois. Each of these states sent Plains a letter notifying it that Kelmar would be conducting the audit as the state's agent.

47.     On or about November 21, 2015, Kelmar sent Plains a copy of Kelmar's Exam Orientation Process Guide ("Exam Guide"). This Exam Guide has not been adopted as a regulation or statute in Delaware. In the Exam Guide, Kelmar purports to define the term "related entity" for purposes of the Audit:

> The term 'related entity' is broadly construed and involves consideration of factors including but not limited to ownership, management, control and/or influence, course of dealing and transactions between the parties, corporate policies including conflicts-of-interests statements, the organizational structure, etc. Notably, no single factor alone is determinative of a "related entity" nor is there a specific ownership threshold (i.e., 100% or 80% owned).

48.     On November 24, 2014, Kelmar sent Plains a copy of its Confidentiality & Non-Disclosure Agreement ("NDA"). The NDA purports to give Kelmar the ability to share Plains' confidential information with the other states that have joined the Audit.

49.     On November 25, 2014, Kelmar sent Plains its initial document requests. The requests reveal that Kelmar's objective in the Audit is to first determine which of Plains'

subsidiaries and affiliates will be the most lucrative audit targets. In its Exam Guide, Kelmar refers to this phase of the audit as "Entity and Property Type Scoping." Notably, none of the information that Kelmar is requesting has any particular nexus to the State of Delaware.  Among other things, Kelmar asks for:

- Federal tax returns, including a Form 851 Affiliations Schedule;

- a Consolidating Income Statement "listing P&L by line items broken out by legal entity";

- a Consolidating Balance Sheet, listing all Balance Sheet line item broken out by legal entity;

- a corporate organization chart including "parents, subsidiaries, affiliates and related entities"; and

- a list of all legal entities that pay liabilities on behalf of other legal entities.

50.     On December 23, 2014, Plains sent Kelmar an email asking to evaluate Kelmar's data security procedures and controls, so that Plains could better evaluate Kelmar's proposed non-disclosure agreement. Consistent with its reputation, Kelmar's response was aggressive and unaccommodating—"*While we appreciate that Plains All American Pipeline may have concerns about data security, Kelmar will not provide the reports requested nor will Kelmar be subjected to an audit by Plains All American Pipeline.  Our client states simply do not require that Kelmar undergo such a review where the audit is not a voluntary engagement and Kelmar is not a vendor of your choosing.*" Nor does Delaware law protect the confidentiality of Plains' financial information and highly proprietary data or Plains' privileged documents; Delaware law only protects (1) the amount of unclaimed property and (2) "the terms of or supporting documentation related to any annual filing, unclaimed property voluntary self-disclosure agreement, or settlement agreement resulting from the reporting of any unclaimed property pursuant to this

chapter." DEL. CODE tit. 12, § 1141(b).  It does not protect all documents inspected or copied by Kelmar.

51.     On January 20, 2015, Plains sent Ms. Whitaker, who had stated that she was the "final arbiter of all disputes that may arise during the course of the examination," a letter asserting numerous objections to the proposed Audit. In addition to generally asserting that the Audit violates its due process and Fourth Amendment rights, Plains specifically objected to:

- Kelmar conducting the Audit while having a financial stake in the Audit's outcome;

- Kelmar's insistence on a multistate audit in which it is given authorization to share Plains' confidential information with other states;

- the undefined scope of the Audit and the lack of established procedures;

- the purported inclusion of Plains' Subsidiaries and Related Entities;

- the breadth and rational of Kelmar's initial document requests; and

- Kelmar's use of "estimation" under § 1158.

52.     In a letter dated March 30, 2015, Ms. Whitaker dismissed all of Plains' objections, informing it that "the State will perform [Plains'] examination with the assistance of its duly authorized agent, Kelmar Associates, LLC ('Kelmar'), and in accordance with standard examination processes authorized by the Statute and pursuant to Delaware's Unclaimed Property Regulations, and utilized on all other examinations." Ms. Whitaker's response is in stark contrast to the open-minded philosophy she put forth in a recent Task Force meeting, where she claimed that "if [holders] have an alternate way to suggest for doing the audit her office is open to considering that." *See* TFR (Exhibit A) at 45.

53.     In response to Plains' objection to a multistate audit, Ms. Whitikar stated, "multistate examinations performed by third-parties are common and reduce the burden on holders that may otherwise be subjected to multiple separate state examinations requiring the production of

overlapping information." Ms. Whitaker, however, does not explain why Delaware needs or is permitted to conduct a multi-state audit to determine Plains' compliance with the DUPL, which is supposed to be the sole purpose of the Audit. In reality, the only beneficiary of a multistate audit is Kelmar.

54.     In response to Plains' objection to the temporal scope of the Audit, Ms. Whitaker stated, "the State's examination authorization letter makes clear that the review of records will include the years 1981 through the present as permitted by the Statute." Ms. Whitaker does not identify which statute permits the State Escheator to go back to 1981. The only authority for this excessive "look-back" period is the self-serving regulation that was promulgated by the State Escheator in 2012.

55.     In response to Plains' objection regarding the relevance of Kelmar's initial document requests, and the purported inclusion of Plains' Subsidiaries and Related Entities in the Audit, Ms. Whitaker stated, "Kelmar's initial document request seeks records that will be utilized to narrow the scope of the review to include only those legal entities with a likelihood of holding unclaimed property. These records will also be used to verify the completeness of future records (e.g., general ledgers, aged trial balances, check registers, etc.)." Ms. Whitaker's response only confirms that Kelmar's first objective in the Audit is to investigate Plains' Subsidiaries and Related Entities to determine which of them will be vulnerable to estimation in an *actual* unclaimed property audit, and thus profitable to Kelmar.   This type of pre-audit investigation is not permitted by § 1155 of the DUPL, which allows the State Escheator to audit "a person" for one purpose: "to determine whether [it] has complied with any provision of this chapter[.]"

56.     Moreover, because the State has yet to identify which "Subsidiaries and Related Entities" it intends to Audit, the State has not provided "reasonable notice" of the examination as required by § 1155.

57.     In response to Plains' objection to Kelmar conducting the Audit while having a financial stake in its outcome, Ms. Whitaker stated, "such a payment arrangement does not create a conflict of interest as the State actively oversees the unclaimed property examinations conducted by third parties and retains final authority with respect to discretionary matters and any findings or demands." While the State may have the authority to overrule Kelmar, Kelmar is still the one that directs the Audit as it is progressing; the statutes and regulations do not provide any process by which to challenge or dispute Kelmar's actions. Kelmar leads the opening conference; Kelmar makes the document requests; Kelmar does the preliminary "scoping" and decides what entities should be audited; Kelmar decides whether estimation is necessary; and Kelmar is the one that prepares the initial report proposing liability.  No statute or regulation acts as a check or control on this private entity's actions as an agent of the State.

58.     Kelmar, moreover, is conducting the Audit as the agent for twelve different states. These states have already given Kelmar complete control and do not intend to have any involvement in the Audit.  For example, Plains sent letters to Connecticut, Wisconsin, and South Dakota objecting to their audits and later received nearly identical responses from each of the three states. The responses are attached as **Exhibit B**.

59.     In her March 30 letter, Ms. Whitaker refused Plains' request that Delaware sign a confidentiality agreement.  In an attempt to address Plains' concerns about sharing its confidential information with Kelmar, Ms. Whitaker stated that "sufficient protections exist under Delaware law" to prevent disclosure of a holder's information.  To support this, Ms.

-17-

Whitaker referenced § 1441 of the DUPL and DEL. CODE tit. 29, §10002.  But Ms. Whitaker failed to address the fact that Kelmar's non-disclosure agreement, which Kelmar has insisted that Plains sign, gives Kelmar express permission to share Plains' confidential information with other states.

60.     In response to Plains' objection to use of estimation, Ms. Whitaker stated, "the State will not agree to a bar on the use of estimation techniques should the examination demonstrate that [Plains] failed to maintain adequate records." Ms. Whitaker suggestion that the State may use estimation is disingenuous. During the Task Force meetings, a Kelmar representative admitted that "general ledger audits almost always involve projection and estimation." *See* TFR (Exhibit A) at 40. And, in its final report, the Task Force found that 80-85% of the revenue derived from general ledger audits is attributable to estimation. *Id.* at 8.   If the Audit goes forward, there is absolutely no doubt that estimation will be used.

61.     Ms. Whitaker ended the letter by stating that Plains was "directed to fully cooperate with Kelmar, produce the records requested, and schedule an opening conference." Ms. Whitaker also warned Plains that "the State [would] consider the level of [Plains'] cooperation when determining whether penalties should be assessed, or whether any other statutorily available actions should be taken in connection any past-due unclaimed property that is identified as a result of the examination."

62.     As Ms. Whitaker stated, she is the "final arbiter" of all disputes arising during the examination process.  Neither Delaware law nor the State Escheator's regulations provide for any court review or enforcement of any aspect of the examination procedure.

63.     Plains has fully exhausted its administrative remedies.  Moreover, there is no provision in the DUPL or any other Delaware law requiring Defendants to go to a Delaware state

court to enforce their right of examination and their claimed right to issue document requests; accordingly, there is no other means by which Plains can obtain pre-enforcement court review of Defendants' actions. Plains' only alternative is to risk the imposition of penalties for failure to comply.

64.     The procedures for review of an assessment of penalties or amounts owed do not permit any court review of procedural challenges. To the extent that the so-called "independent reviewer" has the power to consider procedural challenges, this review does not comport with due process because the Secretary of Finance, the agency that is imposing these unconstitutional procedures, chooses the independent reviewer. The Court of Chancery's review of the agency's determination of amounts due and owing is limited to consideration of whether the independent reviewer's decision was supported by substantial evidence in the record. The Court of Chancery is not accorded any power to determine whether the record was improperly affected by unconstitutional procedures or denials of due process.

## COUNT I
### (Unreasonable Search and Seizure)

65.     Plains repeats and realleges the foregoing paragraphs as if fully set forth herein.

66.     The Fourth Amendment to the U.S. Constitution provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated . . . ." *See* U.S. Const. amend. IV.

67.     While acting under color of state law, the Delaware Defendants and Kelmar have subjected and continue to subject Plains to an unreasonable search and seizure.

68.     Delaware's unclaimed property audit is an unreasonable, warrantless search and seizure of Plains' non-public premises and non-public documents that is not permissible under the Fourth Amendment. Kelmar has sent a letter demanding that Plains prepare and send certain

-19-

documents to Kelmar—a demand that is neither authorized by the statute, which only permits an "examination" of books and records, not an administrative subpoena or document request. In addition, the Delaware Defendants' initial letter to Plains states that the Delaware Defendants will examine Plains' books and records and implies that this will take place at Plains' premises.

69.     Neither Defendants nor Kelmar have obtained a warrant, nor do they meet the standards for a warrant in an administrative examination. A warrant in an administrative examination can only be issued if there is (1) specific evidence of an existing violation of the law or regulations by the target of the warrant or (2) some kind of reasonable, neutral statutory or administrative standards or plan for choosing targets or deciding on a schedule of examinations. These standards must be met prior to the issuance of a warrant; after-the-fact justifications do not suffice. Here, there is no specific evidence that Plains violated the DUPL, nor is there any statutory or administrative plan of any kind by which targets are chosen through application of neutral criteria.

70.     To the extent the examination is in the nature of an administrative subpoena, to comply with the Fourth Amendment, an administrative subpoena must be: (1) authorized for a legitimate government purpose; (2) limited in scope to reasonably relate to and further the legitimate government purpose; (3) sufficiently specific that it is not unreasonably burdensome; and (4) not overly broad so that it is oppressive.

71.     Here, the document request is not authorized by law; the scope of the actual request goes beyond information reasonably related to any legitimate interest Delaware has; the statute contains no limitation on the scope of the requests; and the actual requests are overly broad so as to be oppressive. None of the elements are satisfied, and the examination violates the Fourth Amendment.

72.     To the extent the statute permits the issuance of a document request or administrative subpoena, it is unconstitutional on its face because this power is not limited to books and records relevant to the enforcement of the DUPL, and it does not require specificity. Defendant Whitaker has stated that there are absolutely no restrictions on what documents Kelmar can request from a holder. *See* TFR (Exhibit A) at 41.

73.     The "scoping" phase of the Audit is not authorized under § 1155 of the DUPL, because its purpose is not to determine whether Plains—a single legal entity and person—has complied with the DUPL.

74.     Kelmar's initial document requests are not reasonably relevant to the authorized inquiry under § 1155.

75.     Defendants' demand that Plains produce unclaimed property reports filed in other states is not relevant, let alone *reasonably* relevant, to the authorized inquiry under § 1155.

76.     Further, Defendants do not have any authority to issue an administrative subpoena or document request, and their request is therefore unlawful and unauthorized.

77.     Requiring Plains to accede to Defendants' unreasonable and unconstitutional demands will cause Plains to incur the burden of locating, reviewing, and paying for copying and shipping the documents.  Furthermore, and critically important, requiring Plains to comply with these demands will also subject Plains' confidential and proprietary business documents, as well as privileged documents, to be viewed by the public.

78.     Threatening Plains with a penalty for asserting its Fourth Amendment rights is also impermissible.

79.     Plains is entitled to a judgment pursuant to 42 U.S.C. § 1983 declaring that the Audit violates its Fourth Amendment right to be free from unreasonable searches and seizures.

## COUNT II
## (Substantive Due Process)

80.     Plains repeats and realleges the foregoing paragraphs as if fully set forth herein.

81.     The Due Process clause of the Fourteenth Amendment to the U.S. Constitution provides that no state shall "deprive any person of life, liberty, or property, without due process of law." *See* U.S. Const. amend. XIV, § 1.

82.     While acting under color of state law, Defendants have deliberately, arbitrarily, and unreasonably abused their power by (1) subjecting Plains to a costly unclaimed property audit that covers a period of 35 years and (2) ordering Plains to submit to a multi-state audit led by Kelmar that does not adequately protect Plains' confidential business information.

83.     At all times, Defendants have acted without a legitimate government purpose.

84.     The only possible justification for a 35-year "look-back" period is to allow Kelmar and the State Escheator to unfairly penalize Plains for a lack of records by "estimating" its liability.  This is not permissible because Plains was not required by Delaware law to retain the records for which it is now being penalized.

85.     The only possible justification for a multistate audit is to benefit Kelmar's private economic interests.  If Kelmar ultimately asserts that Plains is holding unclaimed property escheatable to other states, Delaware would have absolutely no interest in that property.

86.     Plains has a protectable property interest in the money that it will have to spend, and the corporate resources that it will to use, if it is forced to comply with Delaware and Kelmar's limitless, irrational and arbitrary Audit.

87.     Plains also has a protectable property interest in the confidential business information that it will have to disclose to Kelmar during the Audit, and which Kelmar intends to

-22-

share with other states. Plains also has a protectable interest in preserving the confidentiality of attorney-client and other privileged documents.

88.     Further, the retroactive application of the penalty and estimation provisions of the amended law to penalize Plains for not having records it was never required to keep violates Plains' right to due process.   These provisions interfere with Plains' reasonable investment-backed expectations and attach consequences to decisions made and actions completed many years prior to the amendments to the statute.

89.     Plains is entitled to a judgment pursuant to 42 U.S.C. § 1983 declaring that the Audit violates its substantive due process rights under the Fourteenth Amendment

<u>COUNT III</u>
<u>(Procedural Due Process)</u>

90.     Plaintiff repeats and realleges the foregoing paragraphs as if fully set forth herein.

91.     The Due Process clause of the Fourteenth Amendment to the U.S. Constitution provides that no state shall "deprive any person of life, liberty, or property, without due process of law." *See* U.S. Const. amend. XIV, § 1.

92.     Plains has a protectable property interest in the money that it will have to spend, and the corporate resources that it will have to use, if it is forced to comply with Defendants' limitless, irrational Audit.

93.     Plains also has a protectable property interest in the confidential business information that it will have to disclose to Kelmar during the Audit, and which Kelmar intends to share with other states.

94.     Defendants' Audit, which will deprive Plaintiff of these legitimate property interests, does not contain adequate procedural safeguards.

95.     The Delaware Defendants have delegated their administrative audit authority to Kelmar and have allowed Kelmar to act in a quasi-judicial capacity. During the Audit, Kelmar will decide (1) what documents must be produced; (2) which of Plains' Subsidiaries and Related entities will be audited; and (3) whether, and to what extent, estimation will be used.

96.     The Audit itself has no set procedures and there is no way for Plains to effectively object to Kelmar's demands, especially since Kelmar is purportedly acting on behalf of twelve states.

97.     Kelmar has also developed its own procedures, none of which have been promulgated by any governmental authority.  Any procedures for an unclaimed property audit must be properly enacted by the State of Delaware or one of its state agencies as authorized by statute.  Permitting Kelmar, a private entity, to create its own procedures that are then enforced by the Delaware Defendants is entirely unconstitutional and undemocratic.

98.     Kelmar has a large financial stake in the outcome of the Audit and is not a neutral party. Kelmar's compensation will be contingent on the amount of unclaimed property liability that Delaware ultimately assesses against Plains. In the general ledger audits that Kelmar conducts, 80-85% of liability comes from estimation. Therefore, Kelmar's compensation in the Audit will depend largely on whether it is able to use estimation techniques.

99.     Plains is entitled to a judgment pursuant to 42 U.S.C. § 1983 declaring that the Audit violates its procedural due process rights under the Fourteenth Amendment.

## COUNT IV
### (Ex Post Facto Clause of the U.S. Constitution)

100.    Plains repeats and realleges the forgoing paragraphs as if fully set forth herein.

101.    Article I, § 10 of the U.S. Constitution provides that "No State shall . . . pass any . . . ex post facto Law . . . ."

-24-

102.    In 2010, § 1155 was amended by S.B. No. 272 to allow the State Escheator to estimate a holder's liability if the "records of the holder available for the periods subject to this chapter are insufficient to permit the preparation of a report." This change in the law subjects a holder to penal consequences for failing to maintain adequate record, even though the DUPL has never and still does not contain a document retention requirement.

103.    Prior to the passage of S.B. No. 272, the DUPL contained no document retention requirements or any penalty for insufficient records. Therefore, from 1981 to 2009 Plains was not required by law to maintain unclaimed property records, nor was it subject to penalties for failing to do so. Now, however, Plains is subject to a penalty for not having sufficient records from which Defendants can determine Plains' compliance with the DUPL. The estimation procedure is a penalty because it allows the State of Delaware to seize property from Plains that is not actually tied to any other owner and that is not actually unclaimed.

104.    Ms. Whitaker has made clear that the Audit will cover the period from 1981 to the present, and that Plains will be subject to estimation under § 1155 if the Audit demonstrates that Plains has failed to maintain adequate records for that time period.

105.    Plains is entitled to judgment pursuant to 42 U.S.C. § 1983 declaring that the retroactive application of the 2010 amendments to DEL. CODE tit. 12, § 1155 violates Article I, § 10 of the U.S. Constitution.

## COUNT V
### (Unconstitutional Taking)

106.    Plains repeats and realleges the foregoing paragraphs as if fully set forth herein.

107.    The Fifth Amendment to the U.S. Constitution prohibits the taking of private property for public use without just compensation. The Fourteenth Amendment to the U.S. Constitution makes this prohibition applicable to the states.

-25-

108.    The estimation procedure in the DUPL will always constitute a taking of private property for public use without just compensation.

109.    The estimated amounts owed do not represent actual unclaimed property belonging to another person; rather, the estimated amounts represent what a hypothetical holder would owe if it was holding the unclaimed property.  However, the estimated amount has no rational connection to reality and forces the targeted company to pay the estimated liability not out of unclaimed property, but out of its own funds.  If the holder had identifiable property belonging to another person, there would be no need for estimation.

110.    The property is taken for a public purpose, and here, the moneys received by the Defendants are deposited into the General Fund of the State of Delaware. DEL. CODE tit. 12, § 1131.

111.    Plains is entitled to a judgment pursuant to 42 U.S.C. § 1983 declaring that the estimation procedure in the DUPL is an unconstitutional taking of private property for public use without just compensation.

## COUNT VI
### (Equal Protection)

112.    Plains repeats and realleges the foregoing paragraphs as if fully set forth herein.

113.    The Fourteenth Amendment to the U.S. Constitution prohibits states from denying equal protection of the laws.

114.    The DUPL contains no criteria for selection of audit targets.  Rather, Defendants look for "large and famous" companies that they believe will produce a large amount of money for the State's General Fund. *See* Exhibit A at 16.   The DUPL is intended to facilitate state custody of unclaimed property so that the true owners can locate and retrieve their property.  The

-26-

size, wealth, and fame of the holder of the unclaimed property bears no rational relationship to the purpose of the statute.

115.    Plains has been selected for, and ordered to accede to, an unclaimed property audit under the DUPL using this non-neutral method of selection.  Plains is entitled to equal protection of the laws of Delaware.

116.    Plains is entitled to a judgment pursuant to 42 U.S.C. § 1983 declaring that Defendants have violated the Fourteenth Amendment by selecting Plains for an unclaimed property audit based on non-neutral criteria.

## COUNT VII
## (Injunction)

117.    Plains repeats and realleges the foregoing paragraphs as if fully set forth herein.

118.    The manner in which the Delaware Defendants are exercising their audit authority under § 1155 of the DUPL violates Plains' Fourth Amendment right to be free from unreasonable searches and seizures.

119.    The manner in which the Delaware Defendants are exercising their Audit authority under § 1155 of the DUPL violates Plains' due process rights and right to equal protection of the laws.

120.    The DUPL and implementing regulations are also facially unconstitutional for the reasons stated above.

121.    The Delaware Defendants have threatened Plains with penalties and interest if it does not comply with the Audit.

122.    Plains will suffer irreparable harm if a preliminary injunction is not granted.

123.    Plains has a likelihood of success on the merits of its claims.

DOCS_DE:200116.1 70867/005

124.    Plains respectfully requests that the Court enter an order pursuant to 42 U.S.C. §

1983 enjoining the Delaware Defendants and Kelmar from continuing to pursue the unlawful

Audit.

## PRAYER FOR RELIEF

WHEREFORE, Plains respectfully requests that the Court enter an order:

1.      Declaring that all demands for documents and inspection/examination of documents made by Defendants to Plains as well as the audit/estimation procedures under DEL. CODE tit. 12, § 1155 along with implementing regulations and all Kelmar procedures violate Plains' Fourth Amendment right under the U.S. Constitution to be free from unreasonable searches and seizures;

2.      Declaring that the Audit and the use of Kelmar's procedures deprives Plains of its substantive due process rights under the Fourteenth Amendment to the U.S. Constitution;

3.      Declaring that the estimation procedure in DEL. CODE tit. 12, § 1155 violates Plains' substantive due process rights under the Fourteenth Amendment to the U.S. Constitution;

4.      Declaring that the Audit, the use of Kelmar's procedures, and the audit/estimation procedures under DEL. CODE tit. 12, § 1155 along with implementing regulations deprive Plains of its procedural due process rights under the Fourteenth Amendment to the U.S. Constitution;

5.      Declaring that retroactive application of the estimation procedures enacted in 2010 violates Article I, Clause 1 of the U.S. Constitution and/or that these procedures violate the Fifth Amendment to the U.S. Constitution, and that Defendants cannot estimate Plaintiff's liability under DEL. CODE tit. 12, § 1155 for the time period from 1981 to 2010;

6.      Declaring that the estimation procedures under DEL. CODE tit. 12, § 1155 violate the Takings Clause of the Fifth Amendment to the U.S. Constitution, as applied to the states through the Fourteenth Amendment to the U.S. Constitution;

7.      Declaring that the method of selecting Plains for the Audit violated Plains' right to equal protection of the laws pursuant to the Fourteenth Amendment to the U.S. Constitution; and

8.      Enjoining the Defendants from conducting the Audit and from threatening to impose upon, or imposing upon, Plaintiff with penalties, interest, or estimation of amounts owed under the DUPL if it does not comply.

9.      Such other and further relief that is just and proper.

PACHULSKI STANG ZIEHL & JONES LLP

Dated: June 5, 2015

/s/ Bradford J. Sandler
Bradford J. Sandler (DE Bar No. 4142)
Colin R. Robinson (DE Bar No. 5524)
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, DE 19899-8705
Telephone: 302/652-4100
Facsimile: 302/652-4400
E-mail:    bsandler@pszjlaw.com
           crobinson@pszjlaw.com

and

VINSON & ELKINS LLP
Phillip Bruce Dye, Jr., Esquire
Deborah C. Milner, Esquire
Brock Skelley, Esquire
1001 Fannin Street
Suite 2500
Houston, TX 77002-6760
Telephone: (713) 758-2381
Facsimile: (713) 615-5040
Email: pdye@velaw.com
       cmilner@velaw.com
       bskelley@velaw.com

Counsel for Plains All American Pipeline, L.P.

DOCS_DE:200116.1 70867/005